SCANNED
DATE: 5-1-04
BY:

## **AFFIDAVIT**

I, William J. Argue, on oath, depose and say as follows:

1. I am a Special Agent of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), currently assigned to the Office of the Special Agent in Charge, Boston, Massachusetts (SAC Boston), and have been employed in that capacity since March 2003. I was employed from August 2000 until March 2003 as a Special Agent with the United States Department of the Treasury, United States Customs Service (USCS). On March 1, 2003, most law enforcement functions of the USCS were merged into ICE, a new agency created within DHS. Since August 2000, I have been assigned to the Arms and Strategic Technology Investigations Group. As a Special Agent with USCS and ICE, I have been trained in investigations of violations of laws relating to the export of controlled commodities, including weapons, weapons systems and technology, including, in particular, "defense articles," in violation of the Arms Export Control Act (AECA), 22 U.S.C. § 2751 *et seq.*, the Export Administration Act of 1979 (EAA), 50 U.S.C. App.§ 2401 *et seq.*, and the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701, *et seq.*

2. From August 1997 until August 2000, I was employed as a Special Agent of the United States Department of Commerce, Office of Export Enforcement (DOC/OEE). In the course of my duties, I was responsible for investigating violations of laws relating to the export of controlled commodities and technology from the United States, as established by the EAA and its implementing Regulations, the Export Administration Regulations (EAR), 15 C.F.R. Parts 730 *et seq.* While the Export Administration Act expired on August 20, 1994, Executive Order

-1-    **DOCKETED**

12924, 59 Fed. Reg. 43437, August 23, 1994, continued the EAR in effect under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1706.

3. Prior to my employment as a Special Agent with the DOC/OEE, I was employed as a Patrol Agent with the United States Border Patrol for four years. In my position as a Border Patrol Agent, I prepared affidavits in support of legal process, including numerous search warrants and criminal complaints.

4. Along with other ICE special agents, I am responsible for investigating violations of customs and other federal laws, including violations of laws regarding the importation, exportation, and knowing receipt/possession of prohibited and/or restricted merchandise.

5. This affidavit is submitted in support of a criminal complaint charging two individuals, John CHU and ZHU Zhaoxin, with conspiracy to violate the Arms Export Control Act, 22 U.S.C. § 2778(b)(2) and (c), set forth in greater detail herein, all in violation of 18 U.S.C. § 371. For the reasons detailed below, I believe that there is probable cause to believe that CHU and ZHU did unlawfully, willfully, and knowingly combine, conspire, confederate and agree with one another and with one or more other persons, known and unknown, to commit offenses against the United States, to wit: to export defense articles or defense services designated by the President under 22 U.S.C. § 2778(a)(1) without a license for such export, in violation of 22 U.S.C. § 2778(b)(2) and (c), all in violation of 18 U.S.C. § 371.

6. Since this affidavit is being submitted for the limited purpose of establishing probable cause for issuance of a criminal complaint, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth facts that I believe are necessary to establish the requisite probable cause with respect to the alleged conspiracy.

7. The information contained in this Affidavit is based upon conversations with other law enforcement officers, including an ICE Special Agent who is fluent in Mandarin Chinese, and others, my review of various documents and records, and, where specified, my personal observations and knowledge. Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part only.

## RELEVANT CRIMINAL STATUTES

8. The Arms Export Control Act (AECA), 22 U.S.C. § 2751, *et seq* is summarized in relevant part as follows:

> a. The AECA authorizes the President of the United States to, among other things, control the export of "defense articles." 22 U.S.C. § 2778 (a)(1).
>
> b. The AECA also gives the President authority to designate items as "defense articles." Id. As a practical matter, the U.S. Department of State (DOS) performs that task with the concurrence of the Department of Defense (DOD), in accordance with regulations that are promulgated by DOS, Directorate of Defense Trade Control (DDTC).
>
> c. Pursuant to 22 U.S.C. § 2778(a)(2) and 22 C.F.R. §§ 120.1(a) and 120.2, all items that are designated as "defense articles" are identified by category in a document, prepared by DDTC, that is known as the "United States Munitions List" or the "Munitions List."
>
> d. Pursuant to 22 U.S.C. § 2778 (b)(2), "[e]xcept as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter, except that no license shall be required for exports or imports made by or for an agency of the United States Government (A) for official use by a department or agency of the United States Government, or (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means."
>
> e. All defense article exporters are also required to obtain a valid export license from DDTC for any "defense article" - - regardless of its value - - before

the article is exported to another country. 22 U.S.C. § 2778(b)(2) and 22 C.F.R. § 123(a). In practice, several "defense articles" are often identified on a single "export license." It is a crime for any "defense article exporter" to willfully fail to obtain an export license before exporting a "defense article" to another country. 22 U.S.C. § 2778 (c) and 22 C.F.R. § 127.1(a)(1).

9. The Export Administration Act (EAA), 50 U.S.C. App. § 2401 *et seq.* controls the exportation of all items and technology, including "defense articles," by, among other things, requiring all "defense article exporters" to submit a Shipper's Export Declaration (SEC) to the Department of Commerce (DOC) for each "defense article" that is exported, regardless of its value. 50 U.S.C. App. §§ 2401-20 and 15 C.F.R. § 30.1(a). The DOC is responsible for administering most of the export laws of the United States. Among its other responsibilities, the DOC is charged with the development, implementation and interpretation of U.S. export control policy for dual-use commodities, software, and technology. Dual-use items subject to DOC regulatory jurisdiction have commercial uses and may also have military applications. The EAR prohibit any person from exporting or causing to be exported from the United States any controlled commodity without having first obtained a validated export license from the DOC.

## CURRENT INVESTIGATION

### Background: Investigation from May 2003 to March 2004

A. **Early Negotiations: Night Vision Items**[1]

10. On May 30, 2003, the SAC Boston received information from an industry source that Mr. Sunny BAI, d.b.a. Hong Kong New Crystal International Company, Ltd., 2/F No. 16

---

[1] As detailed below, ZHU and CHU have conspired with each other and with others to purchase defense articles, including pulsed traveling wave amplifiers, also known as traveling wave tubes and TWTs. The course of negotiations for these defense articles took place from Marach 2003 to May 2004. Their negotiations for other articles which may or may not involve defense articles is set forth to provide context for the later negotiations.

Shantong New Village Tai Pont, Kowlong, Hong Kong, was attempting to obtain U.S.-origin generation 3 night vision equipment for export to Hong Kong. Based upon subsequent communications, it has since been determined that Hong Kong New Crystal International Co., Ltd. also operated out of an address within Mainland China: Room 3301B02A, Seg Plaza, Shenzhen, Guangdong Province, China 518031. The night vision equipment BAI was attempting to obtain consisted of 1000 units of ITT Night Vision Industries F9800N generation 3 image intensifier tubes. Generation 3 night vision equipment are defense articles listed on the Munitions List, and as such, are controlled for export by the DOS. Their export requires a valid export license granted by the DOS.

11. In an e-mail dated May 29, 2003, Sunny BAI had contacted ITT Night Vision Industries requesting 1000 pieces of F9800N. A review of part number F9800 revealed it to be a generation 3 image intensifier tube.

12. On June 2, 2003, an undercover company established by SAC Boston, (the "SAC Boston U/C Company") sent an e-mail of introduction to BAI, stating that the SAC Boston U/C Company was an authorized distributor for ITT Night Vision Industries and might be able to assist BAI in his procurement of night vision equipment.

13. From June 2, 2003 through May 6, 2004, the SAC Boston U/C Company maintained undercover communication with BAI and others at Hong Kong New Crystal International Company, Ltd. This undercover communication has included e-mail, telephone, and face-to-face undercover meetings. The purpose of these communications has been to negotiate with BAI and others at Hong Kong New Crystal International Company, Ltd., the purchase of U.S. origin items for export to the People's Republic of China ("P.R.C.") Several of

the items that individuals at Hong Kong New Crystal International, Ltd., were attempting to procure were defense articles controlled for export from the United States.

14. In an e-mail dated June 3, 2003, BAI contacted the SAC Boston U/C Company. BAI requested 1000 pieces of the ITT Night Vision Industries part number F9800.

15. Also on June 3, 2003, the SAC Boston U/C Company contacted BAI via e-mail address xinjing@segit.com.cn. An undercover agent (UCA 1) acknowledged BAI's earlier e-mail, and described the F9800 as a generation 3 image intensifier tube. UCA 1 quoted BAI a price of $2,300.00 (US) per unit and gave contact information for the SAC Boston U/C Company.

16. In an e-mail dated June 4, 2003, BAI contacted the SAC Boston U/C Company and requested to know the "lead time" for the purchase.

17. Also on June 4, 2003, the SAC Boston U/C Company replied to BAI via e-mail. UCA 1 described the delivery time, after receipt of a purchase order, as 300 units in 90 days and then 300 more units in 30-day increments. In addition, UCA 1 stated that as the items were restricted for export by the U.S. government, it would require an export license for shipment from the U.S. UCA 1 further stated that delivery of the items was dependent on receipt of the export license, which would most likely take 90 – 120 days to process.

18. In an e-mail dated July 17, 2003, BAI contacted the SAC Boston U/C Company via e-mail. BAI stated that he was still pursuing the order, but the price quoted was too high, and his customer had a target price of $1700 per unit.

19. On July 18, 2003, the SAC Boston U/C Company contacted BAI via e-mail. UCA 1 stated that the price per unit could be reduced to $2160, but that it would be impossible to meet

BAI's customer's price of $1700 per unit.

20. On August 21, 2003, the SAC Boston U/C Company received a fax from Jenny GUO of the Hong Kong New Crystal International Company, LTD. GUO identified herself as Vice President, Sales and Marketing, with Hong Kong New Crystal International Company, Ltd. GUO further stated that "we (Hong Kong New Crystal International, Ltd.) have been doing military IC (integrated circuit) components for nearly 20 years." GUO further stated that as the SAC Boston U/C Company had a connection with Sunny BAI, she requested a possible meeting. GUO stated she, and possibly her boss, would be coming to the United States in September. GUO further stated that she would be attempting to obtain an unspecified part from a company she identified as "Systron."

21. Internet research revealed that the "Systron" company GUO mentioned in her fax is believed to be Systron Donner Inertial Division/BEI Technologies Inc., 2700 Systron Drive, Concord, California. Systron Donner Inertial Division/BEI Technologies is a manufacturer specializing in the production and design of components used in Commercial Aircraft systems, helicopter systems, military aircraft systems, tactical missile systems, and spacecraft.

22. A review of the TECS II (Treasury Enforcement Communication System II) database revealed that Systron Donner Inertial Division/BEI Technologies is a registrant with the DOS as a manufacturer of items that are controlled for export, as these items are listed on the Munitions List of the AECA. Systron Donner Inertial Division/BEI Technologies has an extensive history of export licenses granted by the DOS. The export licenses were granted for commodities utilized in night vision optics, rocket components, satellite equipment and missile spare parts.

23. Also on August 21, 2003, the SAC Boston U/C Company contacted BAI and GUO via e-mail. UCA 1 confirmed receipt of the fax from GUO dated August 21, 2003. UCA 1 inquired about the status of the negotiations for the ITT Night Vision Industries Image Intensifier Tubes. In addition, UCA 1 stated that the SAC Boston U/C Company could assist BAI in his pursuit of products from Systron Donner, or any other U.S.-based company. UCA 1 further stated that he or an associate would attempt to meet with GUO during her visit to the U.S. UCA 1 requested to know if GUO and BAI's customer was willing to negotiate further on the previously quoted price for the image intensifier tubes.

24. On August 26, 2003, the SAC Boston U/C Company received a fax from GUO, (the fax was incorrectly dated September 22, 2002). GUO stated that she would like to meet in Los Angeles when she and her boss visited. GUO further stated that her boss believed that the price was negotiable. GUO further stated that "It's a quite amount of money, a big order . . . In addition, it's such a sensitive and expensive part (image intensifier tube) that we really hope you could participate in it."

25. On August 27, 2003, I was contacted by the Exodus Command Center, an ICE division that makes determinations as to whether a specific product is controlled under DOS, DOC, or other United States export control laws and regulations. Based on product specifications submitted to ICE's Exodus Command Center and referred to DDTC, the DDTC determined that generation 3 image intensifier tubes are listed in Category XII(c) of the Munitions List and as such, would require an export license from the DOS for export to Hong Kong.

26. Also on August 27, 2003, the SAC Boston U/C Company contacted GUO via fax.

UCA 1 wrote that either he or his associate (UCA 2, also employed at SAC Boston) would meet GUO's party in Los Angeles. UCA 1 further wrote that he would contact the supplier (of the image intensifier tubes) to determine how much price negotiation was possible. UCA 1 further wrote that the product that would be provided was the US military version, the most advanced generation 3 image intensifier tube available.

27.    On August 28, 2003, GUO contacted the SAC Boston U/C Company via the e-mail address solong2021@yahoo.co.uk. GUO provided additional contact information, her office telephone number of 86-755-837-99443, and her home telephone number of 86-755-258-40790.[2]

28.    On August 28, 2003, UCA 1 placed a consensually monitored and recorded telephone call to 011-86-755-258-40790. A female answered and identified herself as Jenny GUO. UCA 1 introduced himself as a representative of the SAC Boston U/C Company. UCA 1 and GUO continued price negotiations for the image intensifier tubes. GUO stated that she and her boss would like to meet in New York, and that they would arrive in New York on either September 16 or 17, 2003. GUO further stated that they would be in the U.S. for two weeks, arriving in Los Angeles on September 7, and departing from the U.S. from Los Angeles on September 19. GUO further stated that her boss was currently meeting with the customer for the image intensifier tubes. GUO indicated that the customer was in China, and the customer was definitely not in Hong Kong. GUO further stated that upon arrival at Los Angeles Airport, she and her boss would be staying at the Hacienda Hotel.

29.    Also on August 28, 2003, the SAC Boston U/C Company contacted GUO via her e-mail address. UCA 1 confirmed the telephone conversation from earlier that day. UCA 1 also

---

[2]    "86" is the international dialing country code for the P.R.C. 86-755 is assigned to the city of Shenzhen, in Guangdong Province, P.R.C. The country code for Hong Kong is "852".

confirmed that he would meet GUO and her boss during their visit to the U.S.

30. On September 1, 2003, GUO contacted the SAC Boston U/C Company via e-mail. GUO wrote that she and her boss would be in Baltimore, Maryland on September 16. GUO requested a meeting with herself, her boss, and UCA 1. GUO identified the persons traveling as:

> Jenny GUO (V.P. Sales and Marketing)
> ZHU Zhaoxin (President and General Manager)

31. On September 2, 2003, the SAC Boston U/C Company contacted GUO via e-mail. UCA 1 confirmed that he and UCA 2 would meet GUO and ZHU on September 16, 2003, and requested that GUO forward her travel itinerary.

32. On September 9, 2003, BAI contacted the SAC Boston U/C Company via e-mail. BAI listed himself as a representative of Hong Kong New Crystal Company. BAI wrote that he had attempted to call the SAC Boston U/C Company, but no one had answered the telephone. BAI wrote that ZHU and GUO were currently in Los Angeles and would be in Baltimore before September 16. BAI further wrote that he would have GUO and ZHU contact UCA 1.

33. On September 11, 2003, UCA 1 placed a consensually monitored telephone call to 626-315-1082. BAI had given this telephone number in an earlier communication as a contact point for ZHU. An audio recording was made of this call. During this telephone call, UCA 1 confirmed with GUO that he would meet with GUO and ZHU in Baltimore on September 16, 2003 at approximately 4:00 p.m. GUO stated that she and ZHU would be attending a "fair" at the Baltimore Convention Center.[3] The location of the meeting among UCA 1, GUO and ZHU was not confirmed.

---

[3] Open source research conducted on the Internet revealed that on September 16 and 17, 2003, the Baltimore Convention Center hosted the 2003 Military Electronics Show. The Military Electronics Show is a venue for designers of military systems.

34.  On September 12, 2003, UCA 1 contacted BAI via e-mail. UCA 1 referred to part numbers ISA-780/1180 and ISG-780/1180, which are generation 3 night vision surveillance cameras manufactured by ITT Night Vision Industries, each of which had been requested by BAI. UCA 1 requested that BAI forward product specifications for the requested products; that is, detailed specifications identifying the specific products BAI wished to purchase.

35.  On September 13, 2003, BAI contacted the SAC Boston U/C Company via e-mail. BAI forwarded specifications for the ISA-780/1180 and ISG-780/1180. BAI further wrote that the products are ITT night vision cameras. BAI wrote that he could be contacted on his mobile telephone number: 86-1300-883-9800.

36.  On September 16, 2003, while UCAs 1 and 2 were traveling to Baltimore to participate in an undercover meeting with GUO and ZHU, UCA 1 received an incoming telephone call from telephone number 410-944-7410. The individual making the telephone call identified herself as Jenny GUO. GUO confirmed that she and her boss would meet the UCAs at the UCAs' hotel, at approximately 4:00 p.m.

37.  Later on September 16, 2003, UCA 2 received a telephone call on the SAC Boston U/C telephone from telephone number 410-245-6086. An audio recording was made of this telephone call. The individual calling identified herself as Jenny GUO. GUO stated that she and her boss were on their way to the meeting.

38.  Still later on September 16, 2003, UCAs 1 and 2 met with ZHU and GUO at the Embassy Suites Hotel, 1300 Concourse Drive, Linthicum, MD. The meeting commenced at approximately 3:30 p.m. GUO served as a translator for the discussion with ZHU.[4] During the

---

[4]  The meeting was consensually recorded and the Chinese language conversations between ZHU and GUO have been translated. I have reviewed the transcripts of the translated

meeting, both ZHU and GUO acknowledged that the items they were attempting to obtain, namely the ITT generation 3 night vision equipment (both the image intensifier tubes and the night vision cameras), were controlled for export by the DOS. GUO, after discussing this with ZHU in Chinese, further acknowledged to the UCAs in English that she and ZHU understood that the items would require an export license from the U.S. Government for export to the P.R.C. GUO further acknowledged that both she and her boss, ZHU, understood that due to the "sensitivity" of the generation 3 night vision equipment, the DOS would not grant an export license to export the items to China. GUO stated that the majority of her company's customers were in Mainland China, and included the aircraft industry and the military, among others. GUO further stated that her company currently had some confidential military contracts. GUO stated that some of their customers were "confidential departments in the Chinese Government." GUO, after discussion with ZHU in Chinese, further stated that her company would open a branch office in the United States, possibly in California, if that would help to facilitate the procurement and export of U.S. origin equipment in the future. GUO, after discussion with ZHU in Chinese, further stated to the UCAs that by opening a branch in the U.S., the SAC Boston U/C Company could make a sale to her company in the U.S., and that her company would be taking all the risk (which the UCAs understood to mean in making an illegal export), and not the SAC Boston U/C Company. GUO, after a discussion with ZHU in Chinese, stated that only their company would get in trouble with the U.S. Government and not the SAC Boston U/C Company. GUO stated that the U/C could sell to the company in the U.S. and "you have no troubles, whatever we want to sell is our business." GUO and ZHU had a discussion in Chinese, and GUO then stated that

---

conversations.

"boss said the problem, need end user to sign, if something happens, cannot deliver to China, the US will close our company not your company." The undercover meeting was terminated at approximately 6:00 p.m.

**B.    Negotiations For Power Components and GyroChips**

39.    On October 3, 2003, the SAC Boston U/C Company attempted to contact GUO via e-mail using two separate e-mail addresses: GUO's, solong2021@yahoo.co.uk, and BAI's, xinjing@segit.com.cn. UCA 1 requested an update regarding the status of the image intensifier order. In addition, UCA 1 requested additional information regarding BAI et al's order of the ISA 780 and ISA 1180 infrared cameras. This e-mail failed to transmit to the above listed addresses.

40.    On January 15, 2004, BAI contacted the SAC Boston U/C Company via his xinjing@segit.com.cn e-mail address. BAI stated that his customers were still discussing the previously-quoted prices. BAI stated that they had recently received a customer request for some products manufactured by a company he identified as Vicor, with an internet address of www.vicr.com. BAI requested the following 14 items in various quantities:

| | | |
|---|---|---|
| 1. | MZ-J20-MY | 150 pieces |
| 2. | MI-J20-MZ | 50 pieces |
| 3. | MI-J22-MZ | 200 pieces |
| 4. | MI-220-MY | 50 pieces |
| 5. | MI-J21-MY | 30 pieces |
| 6. | MI-J21-MZ | 250 pieces |
| 7. | MI-260-MW | 20 pieces |
| 8. | MI-B60-MW | 20 pieces |
| 9. | MI-J62-MY | 20 pieces |
| 10. | MI-J62-MY | 20 pieces |
| 11. | MI-J6Y-MY | 20 pieces |

12. VI-JW4-CW 100 pieces
13. VI-RAM-C1 50 pieces
14. VI-RAM-I2 50 pieces

BAI listed his contact information as:

Tel:     86-755-83665581
Fax:     86-755-83665098
Mobile:  86-1300-883-9800

41. Vicor has been identified as Vicor Corporation, 25 Frontage Road, Andover, Massachusetts 01810. Telephone (978) 470-2900; Fax: (978) 749-3407. The Vicor Corporation designs, manufactures and markets modular power components (including military grade power converters) and power systems. Vicor Corporation's military products have applications in strategic military and aerospace applications. Vicor's military grade power converters are used in a variety of military fighter aircraft and missile systems including, but not limited to, the F-16, F/A-18, Predator Unmanned Aerial Vehicle, Tow Missile, Tomahawk Cruise Missile, and NASA Space Shuttle.

42. On January 20, 2004, I contacted officials at Vicor Corporation. I requested information on the above list of products and sales and marketing information for the above listed items. Officials at Vicor stated that all Vicor product numbers beginning with the "MI" notation are military grade power converters, and currently considered Munitions List items, and controlled for export by the DOS. The official at Vicor further stated that Vicor was currently seeking a commodity jurisdiction from the U.S. Government to determine if the power converters should be considered as controlled for export by the DOC as opposed to the DOS.[5]

---

[5] Although power converters such as those requested by BAI are currently listed on the Munitions List in Category XI(c), that status is currently under review by the government. These negotiations are set forth for background purposes, and because they overlap with negotiations concerning the TWTs, which are on the Munitions List.

43. On January 22, 2004, the SAC Boston U/C Company contacted BAI via e-mail. UCA 1 stated he had spoken with his contacts at VICOR, and that the first product listed, the MZ-J20-MY was a misprint and should actually be listed as MI-J20-MY and not MZ-J20-MY. UCA 1 provided sales prices as follows:

| | Product Number | Quantity ordered | Price per unit | Total Price |
|---|---|---|---|---|
| 1. | MI-J20-MY | 150 | $270 (U.S.) | $40,500.00 (U.S.) |
| 2. | MI-J20-MZ | 50 | $280 | $14,000 |
| 3. | MI-J22-MZ | 200 | $250 | $50,000 |
| 4. | MI-220-MY | 50 | $330 | $16,500 |
| 5. | MI-J21-MY | 30 | $330 | $ 9,900 |
| 6. | MI-J21-MZ | 250 | $250 | $62,500 |
| 7. | MI-260-MW | 20 | $430 | $ 8,600 |
| 8. | MI-B60-MW | 20 | $400 | $ 8,000 |
| 9. | MI-J62-MY | 20 | $330 | $ 6,600 |
| 10. | MI-J62-MY | 20 | $330 | $ 6,600 |
| 11. | MI-J6Y-MY | 20 | $330 | $ 6,600 |
| 12. | VI-JW4-CW | 100 | $124 | $12,400 |
| 13. | VI-RAM-C1 | 50 | $67 | $ 3,350 |
| 14. | VI-RAM-I2 | 50 | $117 | $ 5,850 |

TOTAL PRICE:                                                                                        $251,400

44. On February 3, 2004, BAI contacted the SAC Boston U/C Company via e-mail. BAI stated that his boss was going to the United States and would like to meet with UCA 2 to discuss the Vicor products. In addition, BAI stated that he also needed 20 pieces of part number QRS11-00100-101 manufactured by a company he identified as www.systron.com. The reference is to Systron Donner Inertial Division/BEI Technologies Inc., discussed above at paragraph 21. The product, QRS11-00100-101 has been identified as a "GyroChip". The BEI GyroChip has usable applications in the stabilization of missile seekers, in control systems for aircraft and missile flight control, as a guidance mechanism in missile and inertial/GPS

navigation systems, and as instrumentation in rocket boosters. The BEI GyroChip is contained within the Munitions List within the International Traffic and Arms Regulations, and is controlled for export by the DOS.

    45. Investigation conducted of Systron Donner Inertial Division/BEI Technologies Inc. (SDID), revealed that:

    a) On April 28, 2003, SDID received an inquiry from Sunny BAI for the following items:

    1.    QRS11-010-101, 10 pieces
    2.    C-MIGITSTMIII, 2 pieces

BAI listed his contact information as follows:

    Hong Kong New Crystal International Co., Ltd.
    Tel: 86-755-83665581
    Fax: 86-755-83665098

    b) On the same date, SDID responded to BAI with a Product Quotation (#02-10291). In this quotation, SDID provided pricing information for both products, and additional terms and conditions, to BAI. Contained in the terms, conditions, and special notes section of the quote, SDID stated the following:

> 5) Product ship date is after receipt of purchase order and after we receive the following items: EXPORT LICENSE and our bank notification of arrival of purchase funds. Please allow a minimum of six weeks for SDID to obtain the EXPORT LICENSE. Product lead-time can be minimized by including the completed DSP-83 Form with the purchase order and forwarding the purchase funds by Wire Transfer. Please note: BEI SDID requires a properly completed DSP-83 Form to apply for the EXPORT LICENSE (see note 6).
>
> 6) Export Requirements – The SDID models QRS11 are subject to ITAR (International Traffic in Arms Regulations) and SME

(Significant Military Equipment) Regulations. An Export License must be obtained from the U.S. Department of State before a QRS11 ... can be exported. The customer will be required to complete a DSP-83 Form which will enable BEI SDID to apply for the Export License.

c) On May 9, 2003, SDID received a follow up request from BAI via the e-mail address suyynbai@963.net. BAI modified his request to a single product type, 12 pieces of QRS11-00100-101. BAI listed an additional e-mail contact as xinjing@segit.com.cn. On May 12, 2003, SDID responded with a Product Quotation (#03-10291), providing pricing information and additional terms and conditions. Contained in the terms, conditions, and special notes section of the quote, SDID again stated the items listed as 5) and 6) in quote #02-10291 set forth above. On June 18, 2003, SDID submitted an application/ license for permanent export of defense articles to the DOS. The application listed the following data:

| | |
|---|---|
| Applicant: | BEI Technologies Inc.<br>Systron Donner Inertial Division<br>2700 Systron Drive<br>Concord, CA 94518 |
| Foreign end user: | New Crystal Electronics Trading<br>3/F No 16, Shantong New Village<br>Taipo N.T. Hong Kong |
| Date: | 06/18/03 |
| Commodity: | Quartz Rate Sensor, PN: QRS11-00100-101 |
| USML Category: | XII(b) |
| Quantity: | 12 |
| Value: | $29,784 |

d) On November 3, 2003, U.S. Government officials interviewed Yang Shan BIAO, Business Manager, Hong Kong New Crystal International Co., Ltd., at the U.S. Consulate

Office, Hong Kong. Information obtained from this interview revealed that Hong Kong New Crystal was incorrectly listed on the DOS export license application, and that the end user was stated as:

> Tong Chang Electronics Company
> 196 East Road, Xiao Zai
> Xian, China

e) U.S. Government officials were unable to validate the end user for this product, and Hong Kong New Crystal International Company, Ltd. was determined to be an unreliable handler of controlled United States-origin commodities.

f) On November 14, 2003, the DOS DDTC sent a facsimile to SDID requesting additional information on the export license application submitted by SDID on June 18, 2003.

g) On December 29, 2003, SDID submitted a response to the DOS, answering questions posed in the DOS facsimile dated November 14, 2003. In this response, SDID listed the end user for the QRS11-00100-101 as Xian Tong Chang Electronics in China.

h) On March 4, 2004, based on concerns that Hong Kong New Crystal was not a verifiable end user for the above listed products; the DOS rejected the application for an export license of the defense articles.

46. On February 3, 2004, in response to BAI's e-mail of the same date set forth above in paragraph 44, the SAC Boston U/C Company contacted BAI via e-mail address xinjing@segit.com.cn. UCA 2 stated that he would be happy to meet with ZHU when he came to the United States. UCA 2 further stated that he would be obtaining a sales price for the SDID product shortly. UCA 2 further requested contact information for ZHU in the United States.

47. On February 4, 2004, BAI contacted the SAC Boston U/C Company via the e-mail

address hknc@963.net. BAI stated that ZHU was already in the United States and would attempt to meet on Friday, February 6, 2004, or Monday, February 9, 2004. BAI gave the following as his contact information:

> Hong Kong New Crystal International Co., Ltd.
> Room 3301B02A, Seg Plaza,
> Shenzhen, China 518031
> Tel:    86-755-83665581
> Fax:   86-755-83665098
> Mobile: 86-137-14622977

48. On February 4, 2004, the SAC Boston U/C Company contacted BAI via e-mail address hknc@963.net. UCA 2 stated that he would be able to meet with ZHU on Monday, February 9, 2004.

49. On February 5, 2004, BAI contacted the SAC Boston U/C Company via e-mail address hknc@963.net. BAI listed ZHU's contact number while in the United States as 626-315-1082. In addition, BAI stated that ZHU did not speak English, so that UCA 2 should contact an individual identified as follows :

> Mr. CHU
> 626-437-2370.[6]

50. On February 5, 2004, UCA 2 contacted CHU's cell phone at (626) 473-2370. The individual who answered the telephone identified himself as John CHU. The phone call was recorded. CHU's travel arrangements were discussed. It was established that CHU, accompanied by ZHU, would fly from Los Angeles to Boston on Monday, February 9, 2004. The connection was poor and UCA 2 requested another number where he could reach CHU. CHU stated he would call UCA 2 back at the SAC Boston U/C Company cellular telephone,

---

[6]    This is a cellular telephone number assigned from the Pasadena, California area.

which UCA 2 provided to CHU.

51. Immediately thereafter, UCA 2 received a telephone call on the SAC Boston U/C Company cellular telephone. The phone call was recorded. The caller identified himself as John CHU, and made sure that UCA 2 was available to meet on Monday, February 9, 2004. CHU stated that "we" (which UCA 2 understood to mean CHU and ZHU) would like to order the merchandise. UCA 2 asked which exact products they were interested in, and CHU confirmed the information with an unidentified individual on the other end of the phone conversation. UCA 2 suggested that CHU fax him the information to the SAC Boston U/C Company fax machine. UCA 2 confirmed with CHU that ZHU was the same gentleman UCA 2 met at their previous meeting, which took place in Baltimore. UCA 2 and CHU agreed to meet at 11:00 a.m. on Monday, February 9, 2004 in Boston. CHU gave the following telephone numbers as contact information: (213) 618-9888[7] and (626) 437-2370.

52. On February 5, 2004 the SAC Boston U/C Company received a fax from an unidentified telephone number. The fax was a modified version of the sales quote that the SAC Boston UCA 1 had faxed to BAI on January 27, 2004, from which item numbers 10, 12, 13, and 14 had been scratched from the quote. The quantities were also modified as follows:

| Product Number | | Quantity ordered | Price per unit | Total Price |
|---|---|---|---|---|
| 1. | MI-J20-MY | 150 | $270 (U.S.) | $40,500.00 (U.S.) |
| 2. | MI-J20-MZ | 50 | $280 | $14,000 |
| 3. | MI-J22-MZ | 200 | $250 | $50,000 |
| 4. | MI-220-MY | 50 | $330 | $16,500 |
| 5. | MI-J21-MY | 30 | $330 | $ 9,900 |
| 6. | MI-J21-MZ | 250 | $250 | $62,500 |
| 7. | MI-260-MW | 4 | $430 | $1,720 |
| 8. | MI-B60-MW | 4 | $400 | $1,600 |

---

[7]  (213) is an area code in Los Angeles, California.